LUCINDA B. ASHTON and ASHTON INVEST-
MENT COMPANY v. A. H. PENFIELD, AN-
NIE A. PENFIELD, EFFIE McDONALD
SMITH and MERCHANTS' IMPROVEMENT
& INVESTMENT COMPANY, Appellants.

In Banc, March 21, 1911.

1. **CAPACITY TO SUE:** Demurrer. Where plaintiff's legal in-
capacity to sue does not appear on the face of the petition,
a demurrer is not the proper way to invoke a ruling on her
capacity. Such issue, if raised at all, can only be raised by
answer.

2. ————: **Filing Answer: Waiver.** By filing an answer raising
issues of fact and invoking a trial thereon, defendant waives
any objection to plaintiff's legal capacity to sue.

3. **PLEADING: Filing Intervening Petition After Submission.**
Where a widow, whose deceased husband owned a large per
cent of the stock of a corporation, has brought suit to have
a receiver appointed therefor; and where her husband, during
his lifetime by deed transferred all his stocks and other prop-
erty to another corporation, and subsequently by will gave all
his property to her for life, whether or not the trial court
committed error in permitting said second corporation to file
an intervening petition while the case was under advisement,
asking for a right to share on final distribution in the proceeds
of the corporation, if one should be made, does not call for
determination, for such petition raises no new issues, and in no
wise affects defendant's rights or interests.

4. **RECEIVER: Appointment: Motion to Revoke: Matter of Ex-
ception.** Error in overruling a motion to revoke an order ap-
pointing a receiver of a corporation is not for consideration on
appeal, unless the motion is made a part of the bill of exceptions
or there is a call for it in the bill. Making it a part of the
record proper only will not preserve it for review.

5. **CORPORATION: Receiver: Powers of Equity: Statute.** The
statutes providing a remedy at law for the mismanagement of
a corporation by those in charge of its affairs are not exclusive
and do not oust the ancient and settled jurisdiction of a court
of equity, absent a provision therein to that effect. A court of
equity has power, upon the application of minority stockholders,
to take the affairs of a solvent corporation out of the hands of its

officers and appoint a receiver, as ancillary and in aid of its jurisdiction and decrees to correct the mismanagement, frauds and waste, in cases of urgent necessity; and such necessity arises when there are extreme mismanagement, fraud, waste, impending danger to the corporation, internal feuds impeding harmonious and wise action, an appropriation by its manager of its income, a breach of trust, covinous conduct and a conspiracy between its manager and its majority stockholders to divert its funds from its corporate purposes, and use up all its income in paying fictitious expenses, failure to keep any true account of its income and expenses, and a refusal to let the minority stockholders see its books or examine its accounts.

6. ——————: ——————: ——————: **Pleading: Distribution.** The corporation's property consists of a three-story building in the midst of a growing city, worth $28,000, the three lower floors readily renting for commercial purposes, the second for offices of professional men, the third to a lodge. The building went from a dividend-paying basis to a non-dividend paying one, and no proper excuse is shown. The ratio of its expenses to rent has run from about 43% to 78% for each year. The manager and secretary-treasurer is not a stockholder, but his wife and her sister are, and together they own 51% of the stock, and he controls them, acts for them, thinks for them, and they do as he bids them do. He is shown not to be a suitable person to have charge of a corporation and they, with knowledge of his misconduct and evil purposes, put him in charge as its only active officer and chief manager. The other stockholder, holding 49% of the stock, is their mother, and she has arbitrarily been fenced off from any part in its management, or to examine its accounts or see its books, which have been kept in confusion and made to show a fictitious surplus, which cannot be found. He has been given a salary of $600 a year, and furnished offices in the building, free of rent, when the rent alone would almost be a fair exchange for his services. Deep-seated corporate dissentions are shown as ills necessarily breeding weakness and danger. *Held*, that a petition by the minority stockholder, alleging these facts, states a cause of action for the intervention of a court of equity and the taking of the management of the corporation's affairs out of the hands of its officers, and placing them in the hands of a receiver, though not for a dissolution of the corporation or a distribution of its assets.

*Held,* by GRAVES, J., dissenting, that the ultimate purpose of the petition is to obtain a decree dissolving the corporation, and the mass of matter therein is all set forth as an inducement to that one ultimate purpose, and therefore it does not state a cause of action.

7. ——————: ——————: ——————: **Silence: Inefficiency.** Stress should be laid on the fact that the directors and officers of the cor-

poration are silent when fraud, extravagance, mismanagement, oppression and injury are charged and proven; and also on the fact that mismanagement and misconduct are not the product of ignorant inefficiency or mere difference of opinion in the administration of complicated and delicate affairs.

8. ——————: ——————: ——————: **Dissolution.** A court of equity is without jurisdiction, in any extreme case, to dissolve a corporation and make distribution of its assets. It can appoint a receiver and keep him in charge until such time in the future as it finds full equity done, and then it should lift its hand and retire.

*Held*, by VALLIANT, C. J., dissenting, that by its final decree the only matter adjudicated by the trial court was a dissolution of the corporation and the appointment of a permanent receiver, and these things a court of equity has no jurisdiction to do.

*Held*, by GRAVES, J., dissenting, that the majority ruling does by indirection that it concedes it cannot do by direction; that its ultimate effect is to put a solvent corporation to death, by the appointment of a receiver to act for the owners of the property for such a time as the chancellor may decree; and that the fervor with which some courts reach out the arms of equity and appoint receivers of solvent and going corporations, is not to be commended.

Appeal from Buchanan Circuit Court.—*Hon. Lucian J. Eastin*, Judge.

REVERSED AND REMANDED (*with directions*).

*Chas. C. Crow* and *Rusk & Stringfellow* for appellants.

(1) The court erred in appointing a receiver of the Merchants' Improvement and Investment Company. (a). The petition did not state facts sufficient to constitute a cause of action or entitle the plaintiff to any relief. Nothing is better settled than that the appointment of a receiver is not the end and object of litigation, but merely a provisional remedy resorted to for the purpose of preserving property involved in litigation, so that the relief awarded by the court, if any, may be effectual. State ex rel. v. Ross, 122 Mo. 435; Miller Bros. v. Perkins, 154 Mo. 637; Vila v. Light Co., 68 Neb. 222. In the absence of a statute,

and except as to proceedings under statutes, we believe no exception will be found to the rule that the appointment of a receiver is ancillary. (b) There was no property or interest in jeopardy requiring handling by the court. The appointment of a receiver has been called an equitable execution. A receiver is an officer through whom the court preserves or administers property impounded by it. There must first be property in its custody, and some suit pending involving rights or interests in this property. 23 Am. and Eng. Ency. Law, 1001; Miller v. Perkins, 154 Mo. 629. (c). This corporation was a solvent and going concern. "So long as a corporation is solvent and a going concern no court has the right to place it in the hands of a receiver." State ex rel. v. Deering, 184 Mo. 647. (d). No evils were shown to exist warranting this appointment. State v. Deering, 184 Mo. 647; State ex rel. v. Bank, 197 Mo. 574. The usual grounds for the appointment of a receiver are not stated in the petition, and the evidence as shown by the record disproves the existence of any ground for such action, and even where evils are shown the extreme measure of appointing a receiver should not be resorted to when any other means of correction are available. The appointment of a receiver is employed as a last resort. High on Receivers (3 Ed.), sec. 553; St. Louis National Bank v. Field, 156 Mo. 306; Alderson on Receivers, secs. 349, 351. A court will not appoint a receiver when the party applying can assert his rights by direct action at law. 23 Am. and Eng. Ency. Law, 1003. The petition prays that the officers and directorships be declared vacant. There are no allegations in the petition warranting this prayer, and even if there were this proceeding is not the proper one by which to arrive at that result. Amotion of corporate officers was never a branch of equity jurisdiction. Thomp. Corp., secs. 4554, 826, 3877, 3878. It may also be said that there was no order

or decree made ousting the officers and directors. The principal action taken was to appoint a receiver, and the only judgment finally rendered was that of dissolution. (2) The court erred in entering a decree to dissolve the company. It is admitted in this case that the Merchants' Improvement and Investment Company is a corporation duly organized and existing under and by virtue of the laws of Missouri; that it has property of the value of twenty-five thousand dollars; that it is not indebted to any person in any sum whatever; and that Mrs. Smith and Mrs. Penfield are the owners of the majority of the stock of the corporation, and are two of the three directors managing the corporation. The only relief granted plaintiff was a dissolution of the corporation in a suit where she was the only party plaintiff and an order that the property owned by this corporation be distributed to the stockholders. Clearly the court had no power to render this decree. Wheeler v. Pullman Co., 17 L. R. A. (Ill.) 818; Platner v. Kirby, 115 N. W. (Ia.) 1032; Atty. Gen. v. Utica Ins. Co., 2 Johns. Ch. 371; 10 Cyc. 988, 1305; 17 Ency. Pl. & Pr. 414; 9 Am. & Eng. Ency. Law, 601; State ex rel. v. Railroad, 140 Mo. 511. The demurrer to the petition, motion to strike out, objection to introduction of evidence, and the motion to set aside the order appointing receiver, should all have been sustained. There is no evidence of any improper act committed by any of the defendants, and even if there was the penalty would not be the death of the corporation and the taking of its property without compensation or consideration; the only remedy would be to correct improper conduct, if any, but in this case there is no evidence of any improper conduct. The property of this company has been taken by the court, and the owner thereof has been deprived of its possession and enjoyment, without requiring the person at whose instance it was taken to give any bond to protect it from loss or damage. The constitutional

provision prohibiting the taking of private property for private purposes has been wholly ignored and violated. Mo. Constitution, art. 2, sec. 20. (3) The court erred in holding the petition sufficient as a foundation for any relief and in finding that there was evidence for the foundation of any decree under the petition. Pullis v. Pullis, 157 Mo. 565; State ex rel. v. Deering, 184 Mo. 661. Defendant corporation was solvent, was a going concern, was in the hands of its regularly constituted officers, had no assets that were perishable or in any way in jeopardy. It is not charged with the violation of any law that would forfeit its life, nor with having abandoned the purposes of its organization, nor with acting *ultra vires* nor against the policy of the law, nor to have done or suffered to be done anything to render it an outlaw, or to make it a proper subject of dissolution. The only relief asked is the ouster of the directors and officers, the appointment of a receiver, an accounting from Penfield, who was merely a hired agent of the corporation, and the dissolution of the corporation. The relief of ouster could be had if grounds existed at law and under the statute, and the appointment of the receiver was improper, as was also the dissolution of the corporation. As to the prayer for recovery against Penfield, alleged to be the hired secretary of the company, there is neither allegation nor proof on which to base any relief in this regard, but even if there were there is no suggestion made in the petition, nor intimation from the evidence, nor any reason apparent why such recovery, if any is due, might not be had against Penfield or Mrs. Penfield, his wife, if he was acting for her, just as recovery might be had against any agent for misappropriating his principal's funds. If an equity can be derived and a receiver appointed by joining Penfield with the other defendants in this way, even supposing he had been charged and found guilty, why can the same result not be accomplished whenever an

agent is found to have been unfaithful to the corpora-
tion by which he is employed? This is not primarily
a business man's suit nor a suit founded on monetary
considerations. The gravamen of the petition is that
plaintiff has been "snubbed" by the other members
of the corporation. If there is any object in this suit
referable to monetary or business considerations it
rests in the fact that it is an attempt to put the minority
in control, and in default of this to wreck the company
and require it to distribute the remnants of its assets.
Nothing is better settled than that if the object be to
put the minority in control, relief will not be granted.
Peatman v. Centerville Co., 100 Ia. 245; Wallace v.
Pierce-Wallace Pub. Co., 101 Ia. 313; Bridgeport De-
velopment Co. v. Tritsch, 110 Ala. 274; Rumsey v.
Cattle Co., 116 Mich. 640; Ponca Co. v. Mikesell, 65
Neb. 98; Fluke v. Emporia City R. C., 48 Kas. 577.

*C. F. Strop* and *Fulkerson, Graham & Smith* for
respondents.

(1) The court did not err in appointing a receiver
of the Merchants' Improvement and Investment Com-
pany. The record shows a course of mismanagement,
fraudulent and covinous conduct and *ultra vires* acts
on the part of appellant A. H. Penfield, as secretary,
approved, consented to and connived in by directors
Annie A. Penfield and Effie McDonald Smith (also ap-
pellants), wholly unfitting them to conduct the com-
pany's business; and such conduct and mismanage-
ment as would, unless checked, soon wreck the cor-
poration. The stockholders are all directors. If the
Merchants' Improvement and Investment Company
were a large corporation with numerous stockholders,
ordinarily the removal of the offending directors and
officers might be an adequate remedy, but in this case,
where there are no stockholders who can take the
place of the offending ones, and where it would seem

that the enmity against respondent is so intense that appellants are willing to jeopardize their own interests to make her holdings unprofitable, and the dissensions are so great as to prevent the successful carrying on of the business, and where the corporation has already become one in which there is no pecuniary gain; in other words, when it has ceased to perform the functions for which it was created by the State, certainly the ends of justice can only be met and equity satisfied by the appointment of a receiver. Cantwell v. Lead Co., 199 Mo. 42; Coal Co. v. Edwards, 103 Ill. 476; Hill v. Gould, 129 Mo. 116; Hingston v. Montgomery, 121 Mo. App. 451; Schmidt v. Mitchell, 32 S. W. (Ky.) 601; Sternberg v. Wolff, 39 Atl. (N. J.) 397; Cameron v. Groveland Imp. Co., 54 Pac. (Wash.) 1128; Jasper Land Co. v. Wallis, 123 Ala. 652; Haywood v. Lumber Co., 26 N. W. 184; Edison v. Phonograph Co., 52 N. J. Eq. 620; Du Pay v. Transportation Co., 82 Md. 408; Sparhawk v. Railroad, 54 Pa. St. 415; Thompkins v. Catawba Mills, 82 Fed. 780; Griffing v. Griffing, 96 Fed. 577. (a) The petition states ample facts to constitute a cause of action and to show plaintiff entitled to relief, and we insist that in this case the appointment of a receiver was necessary to preserve the rights of the minority stockholders, respondents. Cantwell v. Lead Co., 199 Mo. 1; Ponca Mill Co. v. Mikesell, 75 N. W. 46; Haywood v. Lumber Co., 26 N. W. 186; Coal Co. v. Edwards, 103 Ill. 472; Griffing v. Griffing, 96 Fed. 577; Thompkins v. Catawba Mills, 82 Fed. 785; Mfg. Assn. v. Storrow, 92 Fed. 12; In re Lewis, 52 Kas. 660; Davis v. Hofer, 63 Pac. (Ore.) 56; O'Connor v. Hotel Assn., 28 S. W. (Tenn.) 308; Jones v. Morrison, 31 Minn. 140. Appellants virtually conceded the sufficiency of the petition by answering over after their demurrer was overruled. Tuttle v. Blow, 163 Mo. 644. (b) The record in this case is a disgusting spectacle of fraud, corruption, negligence and mismanagement on the part

of A. H. Penfield, consented to and connived in by Mrs. Penfield and Mrs. Smith, and such wrongful acts on their part have resulted in wrong and injury to plaintiff and placed her interests in immediate danger of annihilation, except for the wise and speedy interference of the chancellor. There are only three stockholders in this corporation, and there are none to qualify to succeed the offending directors. Hence this case is wholly unlike one in which the stockholders are numerous, and the matter should be considered and determined much as would a partnership's affairs under similar circumstances. Fougeray v. Cord, 24 Atl. (N. J. Eq.) 499; Edison v. Phonograph Co., 29 Atl. (N. J. Eq.) 197. And whether measured by partnership rules or in the scales of equity, the facts proven justified the decree to "protect the interests of stockholders against malfeasance of the officers in charge of the corporate business and their fraudulent misapplication of its property and funds." In re Lewis, 52 Kas. 660. (c) That this is a solvent corporation is not disputed; but falling into a state of coma and rapidly declining, with none to minister to its needs, it was, when this suit was brought, a paralytic to such an extent that it was unable to move, no dividends having been paid since 1905. Hence we are compelled to dissent from appellant's statement that it was a "going concern." Plaintiff's interests were in imminent peril, and the law affording no adequate relief, a court of equity is warranted in taking charge of the business under such conditions. Griffing v. Griffing, 96 Fed. 557; Miner v. Ice Co., 53 N. W. (Mich.) 218; Thompson v. Greeley, 107 Mo. 577; Hawes v. Water Co., 104 U. S. 450; Morawetz on Private Corp. (1 Ed.), p. 400, secs. 400, 401. Equity never regards the form, but always the substance, and will reach forward and correct the latter in whatever form it may be met. Therefore, if it be necessary, which we deny, in order to do equity in this case, the chancellor

should find, and the evidence warrants the finding, that the corporation was not a going concern. (d) This court has· but to read the record in this case to learn of evils enough and wrongs enough to amply warrant the appointment of a receiver. What relief under the facts in this case could come to plaintiff by the simple removal and disqualification of the offending officers and directors under the statutes? The law affords no relief in this case, but equity does. Cantwell v. Lead Co., supra; Thompkins v. Catawba Mills, 82 Fed. 780; Von Schmidt v. Huntington, 1 Cal. 73. (2) The court did not err in entering a decree of dissolution. Cantwell v. Lead Co., 199 Mo. 42; Edison v. Phonograph Co., 52 N. J. Eq. 620; Miner v. Ice Co., 53 N. W. (Mich.) 218; Pratt v. Jewett, 9 Gray (Mass.) 34; Arents v. Blackwell, 101 Fed. 338. (3) The evidence amply sustains the court's finding and decree. Cantwell v. Lead Co., supra; Griffing v. Griffing, 96 Fed. 577; Thompkins v. Catawba Mills, 82 Fed. 780; Mfg. Assn. v. Storrow, 92 Fed. 5; Von Schmidt v. Huntington, 1 Cal. 55; Miner v. Ice Co., 53 N. W. (Mich.) 224; Elliott on Private Corporations (3 Ed.), sec. 433, p. 456. (4) Respondents are entitled to relief. The petition states sufficient facts to warrant the removal of the directors and officers (appellants), either under Sec. 1338, R. S. 1899, or by virtue of the chancery powers of the court, and likewise for the appointment of a receiver under Sec. 1339, R. S. 1899, or under the powers of a court of equity (Lamont v. Egg Co., 109 Mo. App. 53), but to cut off the relief at that would leave the receivership, at least so far as the facts in this case appear, a continuing one, with no present grounds for hope that it might ever be terminated. Surely equity will undertake to give complete relief and the complete relief is the dissolution of the corporation and the distribution of its assets among the stockholders. But if· this court should hold that equity is powerless to aid respondent here, then notwithstanding the fact

that the petition was and is treated by counsel as one
in equity, and was so treated by the court below, yet
if it contains sufficient allegations to constitute a cause
of action under the sections above referred to, this
court may treat the equitable averments as surplu-
sage, and, no jury having been demanded in the trial
court, respondents may have such a judgment as the
facts stated entitle them to, though in the prayer
they ask a different relief. Asking an equitable rem-
edy to which one is not entitled does not make of an
action essentially legal a proceeding in equity. Mc-
Clurg v. Phillips, 49 Mo. 315; Miltenberger v. Monson,
39 Mo. 71.; Peyton v. Rose, 41 Mo. 260; Brown v.
Bank. 5 Mo. App. 1.


LAMM, J.—From a decree in the Buchanan
Circuit Court at its September term, 1908, overruling
the several motions of defendants to revoke an order
appointing a temporary receiver for the Merchants'
Improvement and Investment Company, a corpora-
tion (hereinafter, for convenience, called the M. I. &
I. Co.), finding the allegations of plaintiff's petition
to be true, decreeing that the temporary receiver be
made permanent for the purpose of winding up the
affairs of the M. I. & I. Co. and distributing its assets,
dissolving the M. I. & I. Co., restraining defendants
and each of them from collecting debts or receiving
payments thereon belonging to said M. I. & I. Co., or
from paying out or in any manner interfering with or
delivering to any person, except the receiver, any of its
moneys, properties or effects, and requiring the re-
ceiver to take possession of and sequester its real and
personal property, taking an account of its assets and
property and reporting to the next term of the court
(the court retaining jurisdiction to make such further
necessary orders to carry into effect and execute the
decree, to wind up the business of the corporation and

pay its debts and distribute its assets, etc.), defend-
ants on due steps appeal.

The suit was begun by Lucinda B. Ashton as
plaintiff. The Ashton Investment Company, a cor-
poration, intervened, joined in the prayer and asked
to have its alleged right to certain shares of stock,
held by Mrs. Ashton in the M. I. & I. Co., determined,
and that it be allowed to share in final distribution
in accordance with its interest as so determined.

The scope of the assignments of error seeks a
summary of the pleadings and facts.

The petition need not be reproduced *in totidem
verbis*. Shortly stated, it charges that the assets of
the M. I. & I. Co. consist of personal property and real
estate of the value of $25,000; that it has abandoned
and ceased to exercise its charter rights and purposes
(setting them forth), except in maintaining and rent-
ing its buildings; that its capital stock is $10,000 di-
vided into 100 shares, of which Mrs. Ashton owns
forty-nine, Mrs. Penfield forty-nine and Mrs. Smith
two shares; that three persons constitute its board
of directors; that A. H. Penfield (the husband of
Mrs. Penfield) has always been secretary, treas-
urer and manager of the company; that Mrs.
Ashton acquired her stock through the will of her
husband Thomas, who died in July, 1906; that
Mrs. Smith acquired hers in aid of a con-
spiracy through a pretended assignment from A. H.
Penfield; that A. H. Penfield is a person of bad repu-
tation for veracity and for honesty in business; that
Mrs. Penfield, Mrs. Smith and A. H. Penfield (Mrs.
Smith being a sister of Mrs. Penfield) fraudulently
conspired and confederated together to so use the cor-
porate property as to secure to themselves its profits
and funds for their own personal use and to deprive
Mrs. Ashton of any income, dividend or profit from her
stock. It then goes on to charge that with knowledge

of Penfield's malodorous reputation and his rascality
in its corporate management, his said wife and sister-
in-law had permitted themselves to be wholly domi-
nated by him and had put him in sole charge of the
corporation, its assets and business, had voted him an
exorbitant salary as secretary, had wrongfully per-
mitted him to occupy rooms in the business house of
the corporation free of rent. It then charges with de-
tail, a wrongful juggling of corporate accounts, a
deep-seated dissension (personal and business) be-
tween the directors and between stockholders, the con-
trol of the votes of Mrs. Smith and Mrs. Penfield by
Penfield as their adviser, agent and manager, and the
wrongful and persistent use of such controlling power,
the denial to Mrs. Ashton as a director and stock-
holder of any voice in the management or direction
of the corporate business—all in pursuance of said
conspiracy. Charging there were fraudulent erasures
and alterations of corporate books and failure to keep
true and honest accounts, misappropriations and con-
versions of corporate funds to personal and by-ends,
neglect to conserve and protect the property interests
of the corporation, such confusion and intermingling
of accounts as to make it impossible to state true ac-
counts of expenses, gross earnings or net income, a
denial of the right of Mrs. Ashton to have access to
such books as were kept, a failure to pay dividends
because of reckless mismanagement (all to the injury
of the company), the petition then alleges the boast
of A. H. Penfield that he would see to it that no profits
to the Ashton estate would ever be shown under his
management. It makes other allegations of the same
trend and finally that plaintiff has no adequate rem-
edy at law. The prayer is for the appointment of a
receiver to preserve the property of the company, to
take charge of its said property and its books and ef-
fects, to collect rents and pay existing obligations;
that Penfield be required to account for his official con-

duct in the disposition of the funds of the company and to return all moneys, properties or effects taken or misplaced by him, for the rent of the rooms occupied by him and for all sums wasted through negligence or bad management; that the directorships and other offices held by defendants be declared vacated; that the company's property be sold; that the M. I. & I. Co. be dissolved and the proceeds of the sale of its property be distributed among stockholders, and for such further equitable and proper relief as the circumstances require and to the court seems just.

The petition was verified by the affidavit of Mrs. Ashton, and on the 28th day of May, 1908, the court appointed a temporary receiver pending the final determination of the cause, who was ordered to take charge of the corporation, all its assets, collect outstanding accounts, preserve its properties and assets, take necessary steps to protect the business affairs of the corporation, pay its legal debts—all under the direction of the court—and to give a $10,000 bond for the faithful performance of his duties.

Presently the M. I. & I. Co. filed a motion to revoke the order, and the other defendants filed theirs directed to the same end.

Presently, at the same term, the M. I. & I. Co. filed a general and special demurrer. Demurring generally because the petition did not state facts sufficient to constitute a cause of action, and specially because plaintiff had no legal capacity to sue and because several causes of action are improperly united in the petition.

At the same term the other defendants filed a motion to strike out certain parts of the petition. At the same term the motion to strike out was overruled.

At the next term said movents filed an answer denying every allegation in the petition and alleging that if plaintiff has a cause of action she has a complete and adequate remedy at law. At the same term

the corporate defendant filed its answer to the same effect.

The motions to revoke the order appointing a receiver were taken below with the case on the merits. They appear in the record proper, but do not appear in the bill of exceptions, nor is there any call for them in that bill. As part of its decree the court overruled those motions and the bill shows an exception saved.

The scope of the decree appears heretofore sufficiently.

It will serve no appellate purpose to go in this opinion into the vast details of the testimony of this long record. I have read every line of it. Experts were appointed to state an account from the books of the M. I. & I. Co., to state one between the M. I. & I. Co. and a bank, referred to in the petition as the Bank of Commerce, to state one between that bank and Penfield on certain personal and special accounts involving the affairs of the M. I. & I. Co., and between the Ashton Investment Co. and the M. I. & I. Co. These accounts, together with pass books, and excerpts from the corporate books present a conglomeration of figures and items nearly all of which, disconnected from the testimony, could only be understood, if at all, by an expert bookkeeper. The trial chancellor had the advantage of them together with explanations made by experts on the stand with the books in hand. There were erasures, mutilations, interpolations and changes shown by the books and actually under his eye during the trial, which the silent printed record does not disclose to us. It results therefrom that a court of review does not occupy as good a position as the trial court in weighing discriminatingly many items shown by the books and in grasping the significance of bookkeeping methods evidenced thereby. Accordingly, we shall omit figures in detail (except in one instance hereinafter appearing), and state our understanding of the material facts disclosed.

A. H. Penfield is the son-in-law of Mrs. Ashton—a venerable woman, aged seventy-four years at the trial. In his career he had been with the Chemical National Bank of New York and with the Tootle-Lemon Bank of St. Joseph, was familiar with bookkeeping and was a versatile man of affairs. There is nothing to warrant the conclusion that the trouble, if any, found to exist in the bookkeeping or in the business affairs of the M. I. & I. Co. and chargeable to him, resulted from mere ignorance, inefficiency or inadvertence. Thomas Ashton, his father-in-law, a well-to-do old man, was capable of taking care of his own affairs until disease cut him down. However, Penfield had his confidence as his trusted agent and adviser and transacted much of his business and that of the M. I. & I. Co. until the old gentleman's death in July, 1906. In May, 1905, Ashton had been sick for a time. His sickness culminated in a surgical operation and we infer that during that sickness and thereafter until Ashton's death, Penfield, possibly more than theretofore, managed his affairs and those of the corporation.

At a certain time, say in 1900, the M. I. & I. Co. was incorporated with $10,000 capital stock, divided into 100 shares. It was located in St. Joseph. Its charter life was fifty years. Its charter purposes were to purchase real estate in the county of Buchanan, subdivide the same, if advisable, into lots and blocks, dedicate streets and alleys, to erect houses on such lots or tracts to sell the same, to loan money to assist persons in buying property and improving the same, to negotiate loans on real estate and personal security, and to borrow money pledging its property as security, and to do such acts and things as may be necessary to effectuate such purposes. Penfield was, and Ashton was not, a stockholder at that time. There were three directors, Penfield one of them. Its by-laws show its officers were president, vice-president, treasurer and secretary—the last two combined. That the

duty of the secretary was to keep the seal and minutes
of stockholders' and directors' meetings, to counter-
sign certificates of stock and to serve and publish cor-
porate notices. That the duty of the treasurer was to
receive all moneys, keep faithful account thereof, pay
the obligations out of the corporate funds—the latter
to be kept in some bank in the official name of the
treasurer. He was to make a full detailed statement
once each year and was to have general management
of the corporation. That no officer was to receive a
salary except by vote of the directors. In 1902 Thomas
Ashton purchased stock and was elected a director.
At that time he owned and continued thereafter to
own forty-nine shares. From the outset to this day,
Penfield was secretary and treasurer. At a certain
time Penfield, Ashton and Bullock were the sole stock-
holders. Presently, Bullock's stock was acquired by
the others and Penfield transferred forty-nine shares
to his wife and retained two shares in his own name.
After the death of his father-in-law he transferred
these two shares to his sister-in-law, Mrs. Smith, and
the stockholders at that time were Mrs. Ashton, who
claimed under the will of Ashton, and her daughters,
Mrs. Smith and Mrs. Penfield. At the stockholders'
meeting in 1907 the mother and the two daughters
were elected members of the board of directors, Mrs.
Smith being recognized as a stockholder and the moth-
er voting ''no'' on all substantial matters presented—
among others, the matter of approving the secretary's
report and approving all unapproved minutes, and
waiving the by-law regulation on the transfer of stock
to Mrs. Smith. She did not participate in the ensuing
directors' meeting at which Mrs. Penfield was elected
president, Mrs. Smith vice-president, and Penfield
secretary. This was the first meeting so far as dis-
closed at which the secretary-treasurer made the finan-
cial report called for by the by-laws. Prior to that

time no officer had received a salary, but at that meeting one of $50 per month was voted the secretary.

Going back a little. In 1904 the Ashton Investment Company was incorporated—its charter life fifty years, its capital stock, $15,000, divided into 150 shares of $100 each. In that corporation Thomas Ashton owned 148 shares, Penfield one and a Mr. Sheridan (another son-in-law of Ashton) one. Its charter objects were "to buy, own, hold, improve and sell real estate in Missouri and elsewhere in the United States, to negotiate loans and buy and sell negotiable securities, loan money on real estate and personal security, and to prosecute any other lawful business in which the directors may decide to engage for profit."

Thereafter, in the same year Ashton in consideration of $1 conveyed by warranty deed to the Ashton Investment Company sundry and divers tracts and parcels of real estate in the city of St. Joseph, Missouri, together with whatever personalty was transferred by this clause, viz.: "Also all stocks, bonds, mortgages and all personal property of every description, including household furniture, horses, wagons and farm implements," appearing in the body of the deed. This deed was spread of record the day after its execution and the testimony runs to the effect that Ashton used the Ashton Investment Company thenceforward as a convenience, a vehicle to carry his business ventures and affairs.

In 1878 Ashton made his will, giving all his property to Mrs. Ashton for life, donating to her power to take possession and to exclusively control and manage the same for the enjoyment, use and benefit of herself and for educating and raising the three youngest children. directing that no final distribution be made until his wife cease to be his widow or should die and giving her full power and authority to control, manage, sell or convey absolutely any or all of his estate on such terms as she may see fit and convenient, to control,

manage or reinvest the proceeds of said sales as may to her seem best, to make advancements to their children and on her death or remarriage the rest, residue and remainder of his estate, after carrying out the other provisions of the will, was to be distributed in equal parts to certain named distributees, his children. In that will he mentioned certain advancements made Mrs. Sheridan and Mrs. Smith. In 1896 he executed a codicil in which is set forth certain advancements made his son William, and it is directed that William account therefor. In 1903 he added a second codicil setting forth further advancements to William, revoking certain parts of the first codicil and making a new arrangement in relation to William and certain children of his. That will was probated and Mrs. Ashton, nominated therein as executrix, qualified. In her appraisement and inventory she made no reference to the stock in the M. I. & I. Co., but did inventory the stock in the Ashton Investment Company. We infer the estate is in process of administration.

Singular as it may seem, defendants (barring their plea) stood mute at the trial and introduced no evidence tending to break the force of plaintiff's testimony, to be presently referred to, sustaining the charges of fraud and mismanagement made in the petition, thereby practically confessing the same. That testimony tends to show that the only property owned by the M. I. & I. Co. is a brick building at the corner of King Hill and Missouri Avenues, in the city of St. Joseph, plus the ground on which it stands and certain furniture and fixtures appurtenant thereto. It is three-story structure. The ground floor has three or more business rooms. The second is cut into offices. The third has a hall for lodge purposes and offices. The building is valued at from $25,000 to $28,000, and the ground at, say, $6000. The ground-floor business rooms are severally rented to a clothing man, a drug man and a bank. The offices are rented by pro-

fessional people and the hall by lodges meeting there. After this building was built Penfield organized a small bank, called the Bank of Commerce, of which he was president and the dominating stockholder and spirit. This bank occupied the banking room in said building as a tenant of the M. I. & I. Co., and its books were under the personal supervision of Penfield, and the M. I. & I. Co. was its customer. The testimony shows it went into the hands of a receiver in 1907, but what dividend, if any, it paid is not disclosed. It was permitted by Penfield while a going concern to become indebted to the M. I. & I. Co. in the rise of $1400 for monthly rent, which account was not only not collected as it accrued, but was never presented to the bank receiver and is a total loss as we see it. After the death of Mr. Ashton, Penfield's wife and sister-in-law as directors of the M. I. & I. Co., in 1907, ordered this rent charged off as a loss.

If the M. I. & I. Co. ever used any of its charter powers outside of building said business house and renting and maintaining the same, it is not disclosed. Certainly there is no trace of such use of its franchises for the years just preceding this suit. There was uncontradicted testimony that its simple affairs could be well attended to by any responsible real estate and rent collecting agency for five per cent of its income— say, ten to fifteen dollars, per month. This would include looking after repairs, insurance and taxes, but it would not include a janitor—janitor service having always been provided extra at thirty dollars per month. For this service, when the corporation was paying no dividends and its affairs had been put in confusion, Penfield's wife and sister-in-law, as said, allowed him, in 1907, for the first time in its history, to be employed as secretary at a salary of fifty dollars per month. He is a note broker and loan agent now, apparently was such broker and agent while managing the Bank of Commerce and the M. I. & I. Co. He was, as such note

broker and agent, with a clerk, occupying three rentable rooms in the building by permission of his wife and sister-in-law, rent free, and in his personal business has the use of office furniture belonging to the M. I. & I. Co. This office furniture, we take it, in point of fact, was purchased to refit these offices for his private business as a broker and money loaner. No corporate necessity was shown for such complete office outfit, nor for the use of such offices to the exclusion of tenants. He is now paying the receiver ten dollars per month therefor. Up to the failure of his bank he seems, when occasion called, or necessity spurred, to have used the name of the M. I. & I. Co. to raise money to pay or carry personal obligations at his own bank, having small regard to *meum et tuum*. In one instance he, in a veiled and roundabout way, paid a lawyer's fee of $200 out of the company's funds after Ashton's death for defending a colored man named Flynn for a murder in a gambling fracas. There were other instances in which he used the corporate name on notes for his private purposes and to stiffen his personal credit with his bank, but it is not so clear in the jungle of accounts that eventually the corporation had any of them to pay. In several instances, however there was a shifting of accounts, and moneys disappeared from M. I. & I. Co. funds to reappear in other accounts in his name, afterwards so manipulated that they never got back to where they belonged. We confess to a bad impression arising from such devious and foxy trails. He kept no proper books, no cash book, no journal showing the corporate accounts and business transactions of the corporation from day to day. He kept a ledger which is full of erasures and alterations made by him, all not without a sinister look. He mixed the corporate accounts with his personal accounts in the bank, and handled them in his bookkeeping somewhat as a personal matter. He made no annual financial statements except one. He kept no

account with tenants showing when rooms were occupied and when not, and at what rental and by whom, but he bulked the income of the building in gross, furnishing no clue by which his accounts could be checked up and verified in that behalf. In short, the accounts and business affairs of this. small corporation became inextricably confused and this apparently resulted from a settled course long pursued by him. He is shown to be a man of bad repute for truth and honest dealings, and defendants in the face of such proof offer no countervailing testimony. Mrs. Smith and Mrs. Penfield live in the same house. What one does the other does in the matter of corporate management. They share each other's wishes, hopes and plans and the master-hand guiding and controlling both of them is Penfield under this record. He thinks for them. They move as and when he directs, and there is testimony tending to show that the minutes of the last corporate meeting and directors' meeting were prepared substantially in advance by him and ratified by them. We have no doubt they know of and approve his course and purposes, and, so knowing, have put and hold him in control for personal ends and not for the corporate good and that his management, with their acquiescence, has resulted in radical corporate injury. There is testimony of a veiled boast of his that the corporation should be so managed that the Ashton estate should have no income from it. Whether this boast be true or not, that end has apparently been attained. For years the M. I. & I. Co. either paid or credited dividends, but since the death of Mr. Ashton it has paid none, and no adequate explanation has been made or attempted for this significant fact.

There are other phases of this case not to be overlooked. Mrs. Ashton though recognized as a stockholder, either in her own right or as trustee under the will of Ashton, was refused access to the corporate books and the right to investigate them and was com-

pelled to enforce her right by mandamus in the courts. Not only so, but there are deep-seated corporate and personal dissensions among the stockholders and directors naturally tending to waste, recklessness, unfairness, inefficiency and general bad management.

A matter throwing a flood of light on the relations of the parties owning this family corporation is seen in another suit pending at the time of the trial wherein Mrs. Penfield sues her mother and other distributees of the Ashton estate to set aside a contract evidencing an advancement to her in the sum of $22,000, which contract she alleges was procured by duress and threats of criminal prosecution against her husband for converting to his own use various sums of money belonging to the Ashton estate, aggregating that amount. Light on that phase of the situation is further thrown from the evidence indicating that Penfield used large amounts of his father-in-law's funds to conceal or make good his own overdraft in his own bank when it was under examination by the State authorities in 1905. There is also evidence that having charge of his father-in-law's bank pass book at the time of his death and before, and having been repeatedly asked to deliver it over when his father-in-law was sick, and to executrix after his death, he on one excuse or another did not do so. The pass book was lost or destroyed and simulated or contradictory copies thereof were afterwards furnished by him, which did not agree with the bank books, the original pass book or with each other.

We mention these things merely to show the deep-seated suspicion and dissension existing, and finding voice, in the corporate management.

There was testimony that a small block of stock in a bank, now a tenant of the M. I. & I. Co., had been bought with its funds. But this *ultra vires* act is not shown to have resulted in any loss and is a matter easily corrected.

Over insurance was taken on the building. Policies for $30,000 were carried on a building worth, at the highest estimate, $28,000. The petition charges that this over insurance was carried that Penfield might make a profit on the premiums. That charge is not sustained. Under the receiver the yearly rental of the building is estimated at, say, $4000. The following exhibit (one of many in the record), reproduced in part, summarizes the situation and tells its own story:

STATEMENT OF CASH INCOME, CASH EXPENSES AND DIVIDENDS PAID IN CASH TO STOCKHOLDERS.

1901.

| | | | |
|---|---|---|---|
| Rents, year 1901, March to December, inclusive | | $ 2,578.43 | |
| Interest | $ 838.22 | | |
| Insurance | 347.60 | | |
| Taxes | 88.88 | | |
| Other Expenses | 224.63 | 1,499.13 | $ 1,079.30 |

1902.

| | | | |
|---|---|---|---|
| Rents | | $ 3,043.94 | |
| Interest | $ 794.70 | | |
| Insurance | 73.95 | | |
| Taxes | 86.70 | | |
| Other Expenses | 487.40 | $ 1,442.75 | $ 1,528.39 |

1903.

| | | | |
|---|---|---|---|
| Rents | | $ 3,614.88 | |
| Interest | $ 286.80 | | |
| Insurance | 58.05 | | |
| Taxes | 159.50 | | |
| Other Expenses | 1,081.75 | | |

1904.

| | | | |
|---|---|---|---|
| Dividends | $1,150.00 | $ 2,736.10 | $ 878.78 |
| Rents | | $ 3,065.21 | |
| Interest | $ 84.78 | | |
| Insurance | 449.13 | | |
| Taxes | 78.30 | | |
| Other Expenses | 896.19 | | |
| Dividends | 450.00 | $ 1,958.40 | $ 1,106.81 |

Ashton v. Penfield.

1905.

| | | | |
|---|---|---|---|
| Rents .......................... | | $ 3,047.20 | |
| Interest ...................... | $    80.50 | | |
| Insurance ................... | 516.05 | | |
| Other Expenses ........... | 1,160.83 | | |
| Dividends ................... | 300.00 | $ 2,057.38 | $    989.82 |

1906.

| | | | |
|---|---|---|---|
| Rents ......................... | $3,022.00 | | |
| Interest on bills receivable......... | 12.85 | $ 3,034.85 | |
| Insurance ................... | $  149.08 | | |
| Taxes ........................ | 562.86 | | |
| Other Expenses ........... | 1,640.68 | $ 2,352.62 | $    682.23 |

1907.

| | | | |
|---|---|---|---|
| Rents ......................... | $3,608.54 | | |
| Interest on bills receivable ........ | 19.80 | $ 3,627.74 | |
| Insurance ................... | $  530.93 | | |
| Taxes ........................ | 563.81 | | |
| Salary, A. H. Penfield, Secy. ........ | 300.00 | | |
| Other Expenses ........... | 1,155.26 | $ 2,550.00 | $ 1,077.74 |

1908.

| | | | |
|---|---|---|---|
| Rents ......................... | $  561.50 | | |
| Interest on bills receivable......... | 7.77 | $    569.27 | |
| Salary, A. H. Penfield ........... | 100.00 | | |
| Other Expenses ........... | 169.26 | $    269.26 | $    300.01 |

| | |
|---|---|
| Total Income ................. | $22,581.52 |
| Total Expenses ................. | 12,965.64 |
| Excess of Income .............. | 9,615.88 |
| Total Dividends Paid .......... | 1,900.00 |

Part of trial balance from Secretary's book under date of February 29, 1908:

PROFIT AND LOSS.

| | | | |
|---|---|---|---|
| Insurance ....  ......$ | 2,124.59 | Rents ....  ..........$ | 22,541.70 |
| Taxes ........  ....... | 1,540.05 | Interest .......... .. | 39.82 |
| Interest ........  .... | 2,085.00 | Discount Notes ....... | 500.00 |
| Other Expenses ...... | 7,216.00 | Discount Notes ....... | 400.00 |
| Bal. Surplus Account.. | 10,515.88 | | $23,481.52 |
| | $23,481.52 | | |

SURPLUS.

| | | | |
|---|---|---|---|
| Building ....  ........$ | 27,996.26 | Balance ....  .........$ | 10,515.88 |
| Bal. Dividend Account. | 3,751.85 | Stockholders ....  .... | 21,218.63 |
| | | Bldg. Material Sold... | 13.60 |
| | $31,748.11 | | $31,748.11 |

Ashton v. Penfield.

DIVIDEND ACCOUNT.

| | | | |
|---|---|---|---|
| Paid Ashton .........$ | 931.00 | Balance ........ ....$ | 3,751.85 |
| Paid Penfield ........ | 969.00 | | |
| Credited Ashton ..... | 891.50 | | $ 3,751.85 |
| Credited Penfield ..... | 919.71 | | |
| Balance ........ ..... | 40.64 | | |

$ 3,751.85

STATEMENT OF CASH RECEIVED FOR RENTS AND CASH PAID FOR EXPENSES FROM MARCH, 1901, TO FEBRUARY, 1908, INCLUSIVE:

| YEARS. | 1901. | 1902. | 1903. | 1904. | 1905. |
|---|---|---|---|---|---|
| Rents Received ....| $2,578.43 | $3,043.94 | $3,614.88 | $3,065.21 | $ 3,047.20 |
| Expenses Paid ..... | 1,499.13 | 1,442.75 | 1,586.10 | 1,508.40 | 1,757.38 |
| Excess of Rents over Expenses .... .... | 1,079.30 | 1,601.11 | 2,028.78 | 1,556.81 | 1,289.82 |
| Average Monthly Rents .... ...... | 157.84 | 253.66 | 301.24 | 255.43 | 253.93 |
| Average Monthly Expenses .... .... | 149.91 | 120.23 | 132.17 | 125.70 | 146.44 |
| Ratio of Expenses to Rents .... ...... | 58.14 | 47.40 | 43.87 | 49.20 | 57.66 |

| YEARS. | 1906. | 1907. | 1908. | TOTALS. |
|---|---|---|---|---|
| Rents Received ....| $3,022.00 | $3,608.54 | $ 561.50 | $22,541.70 |
| Expenses Paid ...... | 2,352.62 | 2,550.00 | 269.26 | 12,965.64 |
| Average Monthly Rents .... ...... | 251.83 | 300.71 | 280.75 | 268.35 |
| Excess of Rents Over Expenses .... .... | 669.38 | 1,058.54 | 292.24 | 9,576.06 |
| Average Monthly Expenses .... .... | 196.05 | 212.50 | 134.63 | 154.35 |
| Ratio of Expenses to Rents .... ...... | 77.86 | 70.66 | 47.86 | 57.52 |

Any other vital facts will appear in the course of the opinion.

On such record, error is assigned, for that:

(1). The court appointed a receiver for a solvent and going corporation on a petition stating no cause of action (and herein of whether the petition is sufficient foundation for any relief).

(2). Overruled the motion to revoke the order appointing a receiver.

(3). Entered a decree dissolving the M. I. & I. Co.

(4). Held that Lucinda B. Ashton had legal capacity to sue.

(5). Permitted the Ashton Investment Co. to file an intervening petition while the case was under advisement.

I. *Of the secondary assignments of error.*

Before reaching main propositions, it is better to clear up the case by disposing of minor assignments of error—the 2d, 4th and 5th.

(a). Was there error in holding that Lucinda B. Ashton had legal capacity to sue? The question has several points of view, viz.:

(1). Her legal capacity to sue was challenged only by the demurrer of the M. I. & I. Co. That is regularly the way to raise the question when (and only when) the petition shows on its face her legal incapacity. [Sec. 1800, R. S. 1909.] The second statutory ground of demurrer, as set forth in that section, is: When it shall appear on the face of the petition "that the plaintiff has not legal capacity to sue." In this petition there are no facts stated that either directly or by necessary implication show any legal incapacity in her to sue; hence that ground of demurrer is not well laid.

(2). Moreover, when defendant corporation subsequently filed its answer, as it did, it thereby waived its demurrer in that particular. By filing an answer raising issues of fact, and invoking a trial thereon, it is good and stiff doctrine that a defendant is held to waive all defects—barring two capital ones, viz., that the petition does not state facts sufficient to constitute a cause of action and jurisdiction of the subject-matter. [Hanson v. Neal, 215 Mo. l. c. 277, and cases cited.] Defects of the kind in hand become mere burnt powder after answer made, and a call to hark back to them falls on unheeding ears in a court of *dernier ressort.*

233 Sup.—27

(3).   Where legal incapacity to sue does not appear on the face of the petition, such issue, if raised at all, must be raised by answer. [Baxter v. Transit Co., 198 Mo. 1; Bulkley v. Iron Co., 77 Mo. 105; Fulwider v. Power Co., 216 Mo. 1. c. 582.]   It was held in the Baxter case that a general denial was not sufficient to raise the issue of legal capacity to sue. Neither of the answers in this case has a special plea in abatement or bar raising such issue.

On such premises, the point must be ruled against defendants.

(b).  Was there error in permitting the Ashton Investment Company to file its intervening petition while the case was under advisement? If the dates in defendants' abstract control, this intervening petition was filed after judgment and after motions for a new trial. But there is internal evidence in that abstract of mistake in dates. One of the points made in the motions for a new trial was the permission to file the intervening petition. That point involves an impossibility, an *anachronism,* if that petition was filed *after* the motion. Coming events cannot so cast their shadows before as to be dealt with as facts *in praesenti* in pleas under rules of scientific pleading. The situation is cleared up by an additional abstract of plaintiffs, showing the intervening petition filed before judgment.

The point up is quite delicate. It is evolved from the theory that Ashton's stock in the M. I. & I. Co. passed by his deed to the Ashton Investment Company and became merged in the assets of that company, thereby making it a holding company with the legal title. That subsequently the will of Ashton in favor of Mrs. Ashton, giving her the life ownership of all his property, was operative to convey his then stock in the Ashton Investment Company, which latter stock, by operation of law, took with it all the legal or equitable rights and benefits of the stock in the M. I. & I. Co.

But the point is quite beside the merits, hence the case ought not to be allowed to break there. This, because the intrusion of the Ashton Investment Company raised no issue calling for present determination below or here. Its petition went to its right to share in the *final distribution* of the proceeds of the sale of the assets of the M. I. & I. Co., and calls for determination when that distribution, if ever, is up for final adjudication. [Avery v. Bank, 221 Mo. l. c. 82 to 85, inclusive.] It raised no new issue touching defendants—nor did it impose any new burden upon them. They were in nowise injured by the appearance of the petition in the files. Nor have they concern with the conflicting claims (if any) of the Ashton Investment Company and Mrs. Ashton between themselves, *ergo* that petition calls for no plea from them. Withal, the decree did not dispose of the issue raised by the intervening petition, but left it *in gremio legis*.

We take the point as one without present substance and to be reserved. We so rule.

(c). We also rule the second assignment against defendants. This because, error in overruling the motion to revoke the order appointing the temporary receiver is not regularly here for consideration. Error in such ruling can be reviewed only when the motion itself is part of the bill of exceptions, or where it appears in the record proper (as here) and a call is made in the bill for the motion itself. [Bank v. Bank, 169 Mo. 74; Cantwell v. Lead Co., 199 Mo. l. c. 41; Hendricks v. Calloway, 211 Mo. l. c. 555, *et seq.*, and cases cited.] The matter is crystallized into and regulated by statute. [*Vide*, Sec. 2083, R. S. 1909.] And defendants do not bring themselves within that statute.

II. *The main propositions are related and naturally fall into subdivisions under one head.*

(a). Does the petition state a cause of action for the appointment of a receiver and for other relief? The

question comes up later whether the court went too far in its interlocutory decree. It is necessary, however, to disentangle the last question from the first by determining at the threshold whether the only life of the petition is to dissolve the corporation, wind up its affairs and make distribution among creditors and shareholders. Because if that is the all in all of the suit, then the appointment of a receiver and other relief are so purely incidental and ancillary as not to touch the merits, and the case must ride off solely on the single question of whether the court had power to decree a dissolution and order distributing. In that narrow view of it, if we hold a court of equity lacks power to dissolve the corporation, then the receivership goes by the board.

But we are not able to bring ourselves to the view that this petition states no cause of action except for the dissolution of the M. I. & I. Co. It dealt with a situation having several angles. One declared object of the petition was to preserve and conserve the corporate property by taking it out of mismanaging, wasteful and fraudulent hands, and putting it in the care of the court. Another is the righting of property wrongs suffered at the hands of those in charge. Allegations directed to such relief abound. The prayer is broad enough to include such relief, and both allegations and proof imperatively call for it if it may go on equity principles. Attending to those principles, I think the general doctrine is that however reluctantly equity moves in lifting the affairs of a corporation from its officers and board of directors, yet it *does* move, and that in a known orbit and with vigor. It has large power in that behalf in emergencies appealing to conscience. Corporate insolvency may be a factor worth considering, when present, but actual insolvency is not necessary (as will presently appear) to the exercise of equitable jurisdiction and the supervision of a chan-

cellor through a receivership where there is such gross mismanagement or fraudulent conduct of corporate affairs as head towards corporate disaster and wrong to shareholders.

It is urged that such relief is at law, not in equity, and we are referred by counsel to certain sections of the statutes for the cure of corporate ills.   But those statutes are not preclusive and do not oust the ancient and settled jurisdiction of equity, absent express provision to that effect.   Apposite to that view of it, this court said in Greeley v. Provident Savings Bank, 103 Mo. 222:  "But the circuit court, independent of section 2193, Revised Statutes 1889, had the authority to appoint a receiver in vacation and to subsequently confirm that provisional appointment by an order made on the assembling of court.   The section referred to does not shorten the arm of a court of equity in this particular; since no words of preclusion are used in that section.   [Cox v. Volkert, 86 Mo. 511.]"

Before existing heads and subjects of equity jurisdiction are lopped off, the lawmaker must evince such beheading purpose so unmistakably that there can be no fair two ways about it.   [Baldwin v. Davidson, 139 Mo. 1. c. 126-7, and cases cited; Arnett v. Williams, 226 Mo. 1. c. 118-9.]

The matter was in judgment in another case, Thompson v. Greeley, 107 Mo. 1. c. 586, *et seq.,* and the doctrine of the Greeley case was reaffirmed.   After discussing the general doctrine in High and Beach in their works on receivers, to the effect that courts of equity will not ordinarily take over the management of the affairs of a corporation from its own officers and entrust it to a receiver, MACFARLANE, J., in the Thompson case, points out that the general statement of those authors is qualified by certain exceptions arising from cases of extreme necessity.  "These authors," he says, "place the want of jurisdiction on the ground that a forfeiture of the corporate franchises can only be de-

clared in a court of law in a proceeding in the name
of the State, and the appointment of a receiver and a
sequestration of the corporate property would suspend
the functions of the corporation and virtually operate,
as an annihilation of corporate rights. These are per-
suasive reasons why courts should act with great cau-
tion, and not take the management of the concerns of
corporations out of the hands of directors and mana-
gers, to whom the law has intrusted it, except in cases
of urgent necessity. It is no reason against the ju-
risdiction of the courts when equity alone can grant
adequate relief or protection to stockholders and cred-
itors. These authorities, we think, recognize the juris-
diction, but limit its exercise to cases of extreme neces-
sity.''

In State ex rel. v. Bank, 197 Mo. l. c. 593, *et seq.*,
the question was approached, but plowed round, and
not decided. However, Cantwell v. Lead Co., 199 Mo. 1,
was a suit to appoint a receiver and for relief flowing
from such appointment. The Lead Company was not
insolvent but there were allegations of extreme mis-
management, fraud, waste, impending danger to the
corporation and internal feuds and dissensions stand-
ing in the way of harmonious and wise action. The
question in judgment was: Did the petition state a
case for the appointment of a receiver? We unani-
mously ruled it did. The doctrine of that case has not
been exploded, and should be reckoned with. In the
face of contentions made in briefs and at the bar by
learned counsel for defendants that case may best
speak for itself, thus: ''Courts have hesitated to lift
the affairs and assets of a corporation out of the hands
of its board of directors and administer them through
receivers, and have flatly said so, and given cogent rea-
sons for this hesitancy. . . . But when all this has
been said, it may further be said that this court has
never denied power in a chancellor to prevent a scheme
of irreparable injury and wrong, merely because the

movers in that scheme speak and act in a corporate capacity rather than in an individual capacity. That solvent corporations are wrecked for purely selfish and illegal purposes, that minority interests are 'frozen out,' that business immorality has run amuck under the assumption that courts are powerless, is too true. But the assumption is wrong. Judicial hesitancy does not mean judicial atrophy or paralysis. The board of directors of a corporation are but trustees of an estate for all the stockholders and may not only be amenable to the law, personally, for a breach of trust, but their corporate power under color of office to effectuate a contemplated wrong may be taken from them when, by fraud, conspiracy or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate *entente cordiale* is unfairly destroyed. It would be sad commentary on the law if, when the trustee of a corporate estate is making an improper disposition of it, or has shown improper partiality towards one of its conflicting parties, or has put the estate in a fix it is liable and likely to be either wasted or destroyed, or mercilessly taken from all and given to a part, a court could not reach out its arm and preserve and administer the estate. We have never so declared the law."

In State ex rel. v. Foster, 225 Mo. 171, we issued our writ of prohibition restraining the enforcement of a decree in certain particulars because it went too far. But, observe, in that case we did not interfere with the receivership itself—*contra,* we said this (p. 203): "The court upon the facts as disclosed by the record in that proceeding, had full power to appoint a receiver to take charge of the assets of the corporation." This ruling was our answer to the contention that we should lay a judicial ax at the very root of the case.

And in State ex rel. Sanitol Chem. Lab. Co. v. Geo. H. Williams, Judge (a case in which no opinion

was written), a receiver was appointed below for a solvent corporation on many specifications of gross and fraudulent corporate mismanagement. On application made here on March 29, 1910, for our writ of prohibition, we refused the writ in Banc.

The doctrine of the Cantwell case finds strong support in standard authority.

In Gluck and Becker's Rec. of Cor. (2 Ed.), p. 53, is this: "The inherent power of a court of equity to appoint a receiver of the property of a corporation at the instance of one or more stockholders, charging fraud and mismanagement on the part of the officers in charge, to the imminent danger of the interests of such stockholders, is now too well settled to admit of question." The text is put on the ground that the corporate property "is not safe in the hands of corrupt and irresponsible officials."

In 1 Foster's Fed. Prac. (4 Ed.), pp. 768-9, the sum of the matter is announced thus: "Independently of statutory authority, a court of equity will ordinarily appoint a receiver of the property of a corporation in only eight classes of cases: Firstly, . . . . Secondly, . . . . Thirdly, at the suit of persons interested in the property, whether as stockholders or creditors, . . . where there is a breach of duty by the directors, and an actual or threatened damage of a serious nature, although there is no insolvency. Fourthly, . . . Fifthly, . . . Sixthly, where the governing body is so divided and engaged in such mutual contentions that its members cannot act together . . ."

And in a very late edition of an approved work (3 Cook, Cor. [6 Ed.], bottom pp. 2490, et seq.), the general doctrine is put in this way: "A court will not appoint a receiver merely because some of the stockholders disapprove of the management. A receiver will not be appointed at the instance of a stockholder, even though mismanagement is charged, there being

no fraud and no danger of insolvency. There is a limit, however, to this rule. The powers of courts of equity to appoint receivers are very broad. Thus a court of equity has power to appoint a receiver where there is such fraud or dissension as to make it impossible for the corporation to carry on its business honestly and to the advantage of its stockholders. Such receivership, however, will be granted only in extreme cases and will be limited in time and extent, so far as the circumstances will permit.''

Smith states one of the rules to be (Smith on Rec., p. 359), that a receiver will be appointed "where upon application of a stockholder it is shown that the directors and officers of the corporation are mismanaging its affairs, as for their own personal advantage and gain.''

Morawetz (Pri. Cor., sec. 399) holds to the view that the appointment of a receiver of a solvent corporation must be considered a strong remedy to be justified only in a strong case. [See Alderson, Rec., sec. 347.]

In the leading case of Hawes v. Oakland, 104 U. S. 450, speaking for all his learned brethren, Mr. Justice MILLER said: "That the vast and increasing proportion of the active business of modern life which is done by corporations should call into exercise the beneficent powers and flexible methods of courts of equity, is neither to be wondered at nor regretted; and this is especially true of controversies growing out of the relations between the stockholder and the corporation of which he is a member. The exercise of this power in protecting the stockholder against the frauds of the governing body of directors or trustees, and in preventing their exercise, in the name of the corporation, of powers which are outside of their charters or articles of association, has been frequent, and is most beneficial, and is undisputed.''    In discussing the true foundation for a suit by stockholders, in that case,

the allowable exercise of equity jurisdiction is put sub-
stantially, I think, on grounds announced by quoted
authorities. [See p. 460.]

The trend of the doctrine of many courts is the
same way. For example: Ponca Mill Co. v. Mikesell,
55 Neb. 98; Haywood v. Lincoln Lumber Co., 64 Wis.
639; Davies v. Light Co., 107 La. 145; Sternberg v.
Wolff, 56 N. J. Eq. 389; Stevens v. Davison, 18 Gratt.
819; Miner v. Ice Co., 93 Mich. 97; Wayne Pike Co. v.
Hammons, 129 Ind. 368; Duncan v. Treadwell Co., 82
Hun 376; Cameron v. Groveland Improvement Co.,
20 Wash. 169; Jasper Land Co. v. Wallis, 123 Ala.
652; Griffing v. Griffing Co., 96 Fed. 577. In Tompkins
v. Catawba Mills, 82 Fed. 780, stress was laid on a
deep-seated division in the board of directors which
could not be healed. [Towle v. American B. & L. & I.
Soc., 60 Fed. 131; Arents v. Tobacco Co., 101 Fed. 338;
Red Bud Realty Co. v. South, 131 S. W. (Ark.) 340;
Davis v. Hofer, 38 Ore. 150; O'Connor v. Knoxville
Hotel Co., 93 Tenn. 708.]

Applying the foregoing propositions to the facts
and pleadings, our conclusion is that the petition states
a cause of action for the appointment of a receiver
and other relief falling short of the capital event of
dissolution, and that the facts are of such sort as to
make the case a typical one to be settled by equity
principles. The conspiracy charged is proved in its
scope and ultimate purpose. Fraud and extravagant
and corrupt mismanagement for personal and by-ends,
long persisted in and still existing, whereby the rights
of shareholders have been grievously hurt, make up
the miserable story of the life of this corporation. Its
affairs and books have been put and kept in confusion.
The truth is hid away in bad bookkeeping. Mrs. Ash-
ton having a right to see into its affairs was arbitrarily
fenced off and denied the right to look. Either an in-
grained inability or lack of disposition to protect the
corporation from being used as a personal convenience

and perquisite of Penfield is shown. That Penfield is not a suitable person to have charge is shown. That he controls his wife and sister-in-law, thinks for them and acts for them, and that they do as he bids them do, sufficiently appears. That with knowledge of his misdoings and evil purposes they put and keep him in charge of the corporation as its only active officer and sole manager sufficiently appears. They seem to be one and all unfaithful stewards as trustees of a trust estate, hence have forfeited the right to control that estate, however much they may masquerade under cloak of a majority of the stockholders. The record shows that on top of the capital stock ($10,000), something like $14,000 went into the construction of the building. That Ashton paid his half of this $14,000 is clear. If Penfield ever paid his entire half, that fact is only shown, we think, by rather mysterious bookkeeping. Assuming, however, he did, here is a valuable ten year old building, the sole corporate asset, apparently renting readily in a great city. The ratio of its expense to rent has run from about forty-three per cent to nearly seventy-eight per cent for each year. The building went from a dividend-paying basis to a non-dividend-paying basis and no proper excuse is shown. Its books show a surplus, but, as I see it, that surplus is a fiction of the bookkeeper's art. Certainly, such surplus is not in its chest in cash nor in any other visible asset. With afflictions of this sort its secretary is given a salary of $600 per annum and free rent as a loan agent and money broker, amounting to $120 more, when under the proof the rents would almost be a fair exchange for his services as secretary. The deep-seated corporate dissensions shown are ills necessarily breeding weakness and danger until cured or put aside. There is high authority for the propositions that a house divided against itself cannot stand. Under this record the majority stockholders and directors are in the wrong in matters of difference

and the minority in the right. To hold that such majority may work its will upon the minority when that will seems evil, as here, is but to admit that the arm of a court of equity is too weak or too short. Fortunately, it is neither. We lay stress upon the fact that defendants are silent when fraud, extravagance, mismanagement, oppression and injury are laid at their door and proved to exist; and stress upon another fact, namely, that evils present are not the mere product of ignorant inefficiency or mere differences of opinion in the administration of complicated and delicate affairs. They are the product, apparently, of design and capacity, a disposition and power to wrong. This corporation was not an elaborate and great affair of far-reaching scope and diversified interests, requiring nice discrimination in administration in which differences of opinion might naturally arise among plain, average and well-intentioned people. *Contra,* it is a simple business corporation with simple affairs, requiring only the cardinal house-spun virtues of diligence, economy, zeal and honesty in management to fetch to all its owners a modest return upon their stock investment. We conclude, then, that in the face of injuries, suffered and threatened, the minority stockholder was entitled to a receivership and to the aid of equity in rehabilitating the corporation by such orders, proceedings, suits and management as would attain that result and meanwhile protect the corpus of the estate. Under the facts here the complaining stockholder could get no relief from corporate action. It is not to be supposed the wrongdoers would sue themselves and if they had done so such suit would have been so against reason as to be a transparent fraud; for one party only would be *dominus litis.*

We rule the present assignment of error against defendants.

(b). The remaining question is: Did the decree go too far in dissolving the corporation, thereby end-

ing its life, and ordering the distribution of the estate among shareholders and creditors?

That question has two sides. It has been held in respectable cases that where the situation is so crying as to show the purposes or business of the corporation have been abandoned, or where performance of the corporate purpose is clearly impracticable, or where the trouble is so radical, deep-seated and dominating as to point to inevitable corporate disease, a crippled and non-paying corporate life, equity will wind up its affairs and dissolve it, absent statutory authority. [Arents v. Tobacco Co., 101 Fed. 338, and cases and authorities cited; O'Connor v. Knoxville Hotel Co., 93 Tenn. 708; Miner v. Ice Co., 93 Mich. 97; Gluck and Becker on Rec. (2 Ed.), pp. 54, 55.] But the doctrine of this court runs counter to that and our doctrine accords with the overwhelming weight of authority elsewhere. The rule in this jurisdiction is that a court of equity is without any jurisdiction in any extreme case put to dissolve a corporation and make distribution of its assets. [State ex rel. v. Foster, 225 Mo. 171.] I did not agree to that ruling when made, but was of mind then that the reason of the rule no longer existed in full vigor because of changed business conditions. But there was no call then or now to give voice to contrary views. The matter is settled. *Stare decisis.* On the authority of the Foster case we hold the decree erroneous in the above particular.

Accordingly, the decree should be reversed and the cause remanded with directions that the court enter a decree confirming the appointment of a receiver, overruling the motions to revoke the order appointing him; that the receiver should be kept in charge until such time in the future as the court may find full equity done and that it should then lift its hand and retire, otherwise proceeding in accordance with this opinion, reserving the right to itself in said decree to make such further and other orders and judgments from

time to time as equity and good practice call for. It is so ordered.

*Ferriss, Kennish* and *Brown, JJ.,* concur; *Valliant, C. J.,* dissents in an opinion filed, in which *Woodson, J.,* joins; *Graves, J.,* dissents in an opinion filed, in which *Woodson, J.,* also concurs.

## DISSENTING OPINION.

VALLIANT, C. J.—The plaintiff, Lucinda B. Ashton, on May 21, 1908, filed her bill in equity against the defendants, having for its object the dissolution of the defendant, the Merchants' Improvement and Investment Company, a corporation existing under the laws of this State; the vacation of its offices and directorship; the appointment of a temporary receiver to take charge of its books, property, papers and effects, collect the rents, pay off existing obligations; and to have A. H. Penfield account for his official conduct in the management of the property, and restore all moneys, property and effects of the company taken or misplaced by him as secretary and treasurer thereof; pay the rents of the office occupied by him as an officer of the company, and all other sums lost by reason of misconduct, neglect or bad management; and upon final decree a prayer was made for the distribution of the assets of the company among its stockholders, etc.

A trial was had in the circuit court of Buchanan county, which resulted in a decree in favor of plaintiffs, as hereinafter set forth, dissolving the corporation, and ordering that the appointment of the receiver be made permanent.

Just prior to the rendition of the decree, on motion duly presented, the court permitted the Ashton Investment Company to file an intervening petition in order that its right in the premises might be adjudicated at the same time, which was more or less interested in the matters and things stated in the plead-

ings. Since, however, the filing of this intervening petition did not change the general issues involved in the case, it will be unnecessary to pay any further attention to it.

After moving unsuccessfully for a new trial and in arrest of judgment, the defendants duly appealed the cause to this court.

The record is unusually long; the defendants' abstract thereof covers about 350 pages of printed matter, and the plaintiffs' abstract covers about fifty pages. The petition also is unusually long, covering thirteen pages of printed matter. It will be necessary, therefore, in order to bring the statement of the case within reasonable bounds that a general abridgment of the pleadings and evidence be made.

The bill alleged that plaintiff was the owner of forty-nine shares of the capital stock of the Merchants' Improvement and Investment Company, and Effie McDonald Smith was the owner of two shares, and Annie A. Penfield the owner of forty-nine shares, this being the total capital stock of the company. She further alleged that Arthur H. Penfield was employed as secretary of the defendant company. After alleging the incorporation of the Merchants' Improvement and Investment Company, the material allegations of the petition are substantially as follows:

The corporation had ceased to exercise its rights under its charter, except maintaining and renting building owned by it.

That Thomas Ashton, husband of Lucinda B. Ashton, purchased forty-nine shares of the capital stock on January 6, 1902, and from that time until the date of his death, July 5, 1906, was a stockholder and director of the Merchants' Improvement and Investment Company. That Thomas Ashton, by his last will and testament, gave Lucinda B. Ashton the stock in the Merchants' Improvement and Investment Company for life. That Annie A. Penfield and Effie McDonald

Smith are daughters of Lucinda B. Ashton and of Thomas Ashton, deceased.

The value of the real estate owned by Merchants' Improvement and Investment Company was alleged to be twenty-five thousand dollars, and there is no allegation that it was indebted in any sum whatever to any person.

It is further alleged that A. H. Penfield was interested in the Bank of Commerce, located in the Merchants' Investment and Improvement Company's building, and that as secretary of Merchants' Improvement and Investment Company, and managing officer of said bank, he was enabled to and did use the funds of the Merchants' Improvement and Investment Company to bolster up the bank and his own credit, to the injury and detriment of the Merchants' Improvement and Investment Company.

It is alleged that A. H. Penfield, by virtue of his relations to Annie A Penfield, his wife, and Effie McDonald Smith, his sister-in-law, and by virtue of the fact that he is adviser, business agent, manager and director of said last named defendant, is enabled to and does control their votes and directs their acts in all things pertaining to the company wherein Lucinda B. Ashton's interests are involved, and that the Penfields and Mrs. Smith are hostile to Lucinda B. Ashton.

It is further alleged that Lucinda B. Ashton is not consulted in the management of the affairs of the Merchants' Improvement and Investment Company, and that her rights as stockholder and director are ignored, and that she has no voice in the management of the affairs of the company.

It is further alleged that A. H. Penfield receives a salary of fifty dollars per month for looking after the business as secretary of the company, and that the board of directors had no authority to pay a salary under the by-laws, which is alleged to be as follows:

"The officers of this company shall receive no salary for services, except such as shall be voted by the board of directors."

It is further alleged that the directors have paid out more money than is necessary for expenses, including the fifty dollars salary, which is alleged to be exorbitant.

It is further alleged that A. H. Penfield is occupying rooms of the company as its office and that he also carries on his personal business in said rooms, without paying anything therefor.

It is further alleged that there is a janitor employed by the company to keep the offices in the building clean and this is seriously objected to by the pleader.

It is alleged that A. H. Penfield, Annie A. Penfield and Effie McDonald Smith have combined and conspired together, with the object in view of controlling the management, using up the income and securing the profits and funds of the company for their own use, and to deprive Lucinda B. Ashton of dividends and profits from stock she is alleged to own.

It is alleged that A. H. Penfield is a person of bad reputation and that he has appropriated the funds of the company to his own use.

It is alleged that A. H. Penfield and Annie A. Penfield have charged off upon the books of the company $1450, long past due, that is owing the company by the Bank of Commerce, and that A. H. Penfield, as secretary and manager of the company, did not present the company's claim to the Bank of Commerce, and that A. H. Penfield and Annie A. Penfield were stockholders in the Bank of Commerce at the time.

It is further alleged that A. H. Penfield has caused the property of the company to be insured for a sum largely in excess of its value, and that by arrange-

ment with the agents he received part of the commission.

It is alleged 'that A. H. Penfield has destroyed the cash book of the company, thereby rendering it impossible to secure a correct accounting of the cash receipts and disbursements of the company.

It is further alleged that A. H. Penfield has caused to be eliminated with acid, entries on the books of the company, for the purpose of juggling the accounts, and thereby rendering it impossible to ascertain the gross earnings of the company. That A. H. Penfield has denied Lucinda B. Ashton the privilege of examining the books, and that she was compelled to apply to the court to compel Penfield to permit her to examine the books. That the board of directors purchased stock in the Citizens Bank, a corporation, organized for carrying on a banking business, and that the purchase was unauthorized. That A. H. Penfield, in violation of the by-laws, transferred his stock to Effie McDonald Smith, with the aid and assistance of Mrs. Annie A. Penfield, for the reason that Penfield could depend upon Mrs. Smith doing his bidding. That Annie A. Penfield and Effie McDonald Smith were the tools of A. H. Penfield, and that Penfield had made his boast that Lucinda B. Ashton should not have any dividends from the company.

It is further alleged that Annie A. Penfield, A. H. Penfield and Effie McDonald Smith were not suitable persons to handle money or control their own property, and that the corporation under its present management can no longer serve any useful or lawful purpose.

It is further alleged that Annie A. Penfield, Effie McDonald Smith and A. H. Penfield have entered into a conspiracy to defraud Lucinda B. Ashton of her property right, and that the acts of Annie A. Penfield and Effie McDonald Smith are the acts of A. H. Pen-

field. It is further alleged that Lucinda B. Ashton has no adequate remedy at law, although there is no allegation that Annie A. Penfield and Effie McDonald Smith are not solvent.

There are other allegations in the petition which are wholly irrelevant to the questions here presented for determination, referring solely to controversies between A. H. Penfield, Lucinda B. Ashton, Ashton Investment Company and Bank of Commerce, in which Merchants' Improvement and Investment Company, Annie A. Penfield and Effie McDonald Smith have no interest, knowledge or concern.

In due time defendants filed their separate motions, asking the court to set aside and revoke the order appointing a temporary receiver. It appears that the court refused to pass upon these motions until the final hearing of the cause was reached.

Thereafter the defendant company demurred to the petition, which was overruled by the court.

Defendants then moved the court to strike out certain portions of the petition, which motions were by the court overruled.

These motions and demurrers are too lengthy to be set out here; they cover some fifteen pages.

The defendants then filed separate answers, each of which consisted of a general denial and a plea "that if plaintiffs have any cause of action same is at law which will afford plaintiffs full and adequate relief, and further there is no equity stated in the bill."

The plaintiffs introduced evidence tending to prove the allegations of the bill; and that introduced by defendants tended to contradict those charges and to support the charges contained in the answer.

The decree of the court (formal parts omitted) is as follows:

"Afterwards, and on November 21, 1908, same being a day of the September term of court, order and decree was entered as follows, to-wit:

"The court having heretofore taken up for consideration the motions of the Merchants' Improvement and Investment Company, Arthur H. Penfield, Annie A. Penfield, Effie McDonald Smith, to revoke and set aside the order heretofore made in this cause appointing a receiver herein, and also this cause having heretofore come on for final hearing, that is to say, this court having at the same time taken up for disposition both the aforesaid motions and the trial of this cause upon its merits, and the court having heretofore considered said motions and the pleadings herein, and having heard the evidence adduced by the respective parties, and having taken the cause and all of said matter under advisement, until this time, and now on this day this cause coming on for further hearing the plaintiff appears in person and by Fulkerson, Graham and Smith, and C. F. Strop, her attorneys, and the defendants appear in person and by W. D. Rusk and C. C. Crow, their attorneys, thereupon the Ashton Investment Company, a corporation, ask this court for leave of court to file an intervening petition herein, which leave is by the court granted, and said Ashton Investment Company at this time files said intervening petition. Thereupon this court, upon full consideration of all of the pleadings herein and all of the evidence adduced herein, finds that the allegations of plaintiff's petition are true and that plaintiff is entitled to judgment dissolving the Merchants' Improvement and Investment Company, a corporation, one of the defendants named in plaintiff's petition, and that plaintiff is entitled to a judgment winding up the affairs of said corporation, and that the orders of this court heretofore named herein appointing a temporary receiver in this cause be made permanent for the purpose of winding up the affairs of said Merchants' Improvement and Investment Company and distributing its assets as provided by law.

Ashton v. Penfield.

"It is therefore ordered, adjudged and decreed by the court that the motions of the Merchants' Improvement and Investment Company and Arthur H. Penfield, Annie A. Penfield, Effie McDonald Smith, to revoke and set aside the order heretofore made in this cause appointing a receiver be and the same is hereby overruled, and it is further ordered and adjudged and decreed by the court that the Merchants' Improvement and Investment Company, a corporation, be dissolved, as prayed, and that Elliott Spalding, Esquire, heretofore appointed as temporary receiver herein, be and he is hereby appointed permanent receiver of said corporation, with the usual powers and duties enjoyed and exercised by receivers in accordance with the practice of the court and the statutes in such cases provided. It is further ordered, adjudged and decreed that the defendants and each of them be and they are hereby forever restrained and enjoined from collecting debts or receiving payments thereon belonging to said Merchants' Improvement and Investment Company or from paying out or transferring or in any manner interfering with or delivering to any person excepting the receiver heretofore appointed any of the moneys, property or effects of the said Merchants' Improvement and Investment Company, and said defendants are enjoined and restrained from interfering in any manner with the affairs or management of said company.

"It is further ordered and adjudged that said receiver take possession of and sequester the property, real and personal, of said corporation, and to which said corporation may be entitled, and that said receiver take a true account of the assets and property of said corporation and make his report therein to the next term of this court, and now here this court retains jurisdiction of this cause for the purpose of making such further orders herein as may be necessary to carry into effect and execute the above and foregoing

judgments and decrees, and for the purpose of making such orders as may be necessary relative to the winding up of the business of said corporation and the payment of its debts and the distribution of its assets and as to the conduct of the receivership herein."

I.   While the decree states that the court found all the issues for the plaintiffs, however by reading the entire decree it will be seen that the court did not adjudicate any issue presented by the pleadings, save and except a dissolution of the defendant corporation, and the order appointing the temporary receiver permanent. There is, therefore, no question but those two here presented for review.

Since the trial of this cause in the circuit court, the identical questions here presented have been determinated by this Court in Banc in the case of State ex rel. v. Foster, 225 Mo. 171. That case is so analogous to this, we feel justified in quoting somewhat extensively therefrom.

Among other things, the bill in that case charged that:

"(3). Plaintiffs further aver that said John W. Donnell has been guilty of reckless, fraudulent and extravagant mismanagement in his conduct of the business of said company in that he has paid an agent, named Scritzmeier, whom he employed to devise and operate the aforesaid scheme of contracts heretofore referred to, the sum of four hundred dollars out of every one thousand dollars deposited with it or paid to the Donnell Manufacturing Company under said scheme, and the aggregate of the sums so paid to said agent is more than forty thousand dollars. Plaintiffs further say that the services rendered by said agent Scritzmeier in procuring said contracts did not extend over or cover a period of more than four months, and the said services are well known by the said John W. Donnell not to be worth more than one hundred

or two hundred dollars per month at the time he paid the said sum of forty thousand dollars therefor. Plaintiffs further aver that said John W. Donnell also employed other agents to assist the said Scritzmeier in operating said scheme and in inducing the people to make such contracts and such deposits, paying them the sum of $6250 for a few months' services, although said John W. Donnell, at the time he made such payments, well knew that the services so rendered were not worth the sum of $6250, and knew that they were not in any event worth more than the sum of one hundred dollars per month for each of the agents so employed during the time they were actually engaged in working for said corporation, or a total sum of $600.

"(4). Plaintiffs further aver that said John W. Donnell, by and through his domination and control of the officers of the defendant corporation, has paid to himself, as a pretended salary for his services as the president and general manager thereof, the sum of sixty-nine thousand dollars in excess of the amount of salary which he was lawfully authorized to draw from or be paid by said corporation.

"(5). Plaintiffs further aver that as soon as the deposits above referred to, amounting to more than one hundred thousand dollars, had been made with the defendant corporation by the parties induced to sign said contracts, the defendant, John W. Donnell, paid to himself the sum of $20,050 out of the money so received as a pretended payment of an indebtedness from said corporation to himself; which pretended indebtedness appears on the books of said Donnell Manufacturing Company, but plaintiffs charge and aver upon information and belief that the said pretended indebtedness was wholly fictitious and false, and that said John W. Donnell had no right to make such payment to himself out of said funds, or any other funds or moneys belonging to the Donnell Manufacturing Company.

"(6). Plaintiffs further aver that at the last annual stockholders' meeting of said corporation, which has ever been called by its officers, and which was held in March, 1907, James A. Watkins appeared and protested aganst the adoption of the aforesaid scheme of making contracts and asking for one thousand dollars and two thousand dollar deposits, which said plan and scheme was then being devised by said John W. Donnell; and plaintiffs aver that said protest of James A. Watkins was not heeded by the said Donnell and the other directors of the said corporation. Plaintiffs further aver that neither James A. Watkins nor any other of the minority stockholders of said corporation had then, or had for a long time prior thereto, been given any information about the business or condition of said company, and had been denied any voice in the management of its business.

"(7). Plaintiffs further aver that said John W. Donnell has caused to be made upon the books of the Donnell Manufacturing Company, certain entries and items indicating that said corporation is still indebted to him in a large amount, but plaintiffs aver, upon information and belief, that said pretended indebtedness is wholly fictitious and that said corporation is not indebted to said John W. Donnell in any sum or amount whatsoever, but that on the contrary he is largely indebted to said corporation.

"(8). Plaintiffs further aver that by reason of said misconduct and mismanagement of the business and affairs of said company, its credit has been destroyed and its business has been irreparably injured, and its reputation for honesty and fair dealing has been wholly lost, and that it will be impossible hereafter to carry on its business with profit or success with or without the use of the mails; that the capital stock of said company has become largely impaired, even if said company is not now insolvent, and that for the past year, and several years prior thereto, its

business has been conducted at a large annual loss, and that unless a receiver is appointed to take charge of the business and affairs of said corporation to wind up its affairs and distribute its assets among the creditors and stockholders, its remaining assets will be dissipated, diverted, wasted by said John W. Donnell and his co-directors, and the stock of plaintiffs and other stockholders in said corporation will be rendered worthless.

"Wherefore, the premises considered, plaintiffs pray the court to appoint a receiver for the purpose of taking charge of all the assets and business of the said Donnell Manufacturing Company and of liquidating the same; and they pray that the said John W. Donnell and his co-directors be enjoined from interfering with the management of said business by said receiver, and that the court, by its decree, declare said John W. Donnell and his co-directors, and each of them, ineligible, by reason of their conduct aforesaid, to hereafter hold the office of director in said corporation; and that said receiver, after paying the debts and obligations of said corporation, be directed to divide the amount thereafter remaining among its stockholders pro rata, and that the defendant corporation be dissolved and its existence as a corporate organization terminated."

It is also charged that on account of the fraudulent conduct of the defendants, the Postmaster-General had issued a fraud order denying them the use of the United States mails, etc.

There was an abundance of evidence introduced tending to prove those charges; and the trial court rendered judgment against the unfaithful officers of the corporation for the sums of money which they had misappropriated, appointed a receiver and entered a decree dissolving the corporation, etc.

In discussing those questions, Judge Fox, in speaking for the court, said:

"Directing our attention to the first inquiry, that is, did the chancellor in the case of Watkins et al. v. Donnell Manufacturing Company et al., have the power to enter the decree as indicated, dissolving the Donnell Manufacturing Company, a corporation; or, to put the inquiry in another form, by such decree upon that subject did the chancellor exceed his power in making the decree as herein pointed out?

"The most satisfactory answer to that inquiry can be furnished by pointing to the rules announced upon that subject by the text-writers, as well as to the adjudicated cases treating of that question.

"In the Cyclopedia of Law and Procedure, vol. 10, p. 1305, the rule applicable to this subject is thus stated in the text: 'In the absence of enabling statutes, courts of chancery have no jurisdiction to decree the dissolution of a corporation; nor as a general rule can such a court, during the life of the corporation, wind up its business and sequestrate its property and effects, on the application of a shareholder as such; but when a corporation dies by reason of the expiration of its charter, or becomes substantially dead by reason of the non-user of its franchises, a court of equity has jurisdiction, under principles already elaborated, to lay hold of its assets by its receiver and distribute them among its creditors.'

"A similar rule is announced by the eminent text-writer, Mr. High, on Receivers, sec. 288, p. 249, wherein he states that 'the general jurisdiction of equity over corporate bodies does not extend to the power of dissolving the corporation, or of winding up its affairs and sequestrating the corporate property and effects, in the absence of express statutory authority.'

"Mr. Thompson, in his Commentaries on the Law of Corporations, vol. 4, in treating of this subject, is in harmony with the rule as announced by Mr. High. He says, in section 4538, that 'in the absence of statutes enlarging its powers, the general rule is that a

court possessed of chancery powers merely, has no
jurisdiction, either at the suit of the State through its
Attorney-General, or at the suit of a stockholder or
other private person, to dissolve a corporation and
decree its winding up, for the misuser or non-user of
its franchise, or for other cause; but that the only
proceeding which can be taken to that end is a proceed-
ing by the State, on information in the nature of a
*quo warranto,* in a court of common law jurisdiction.
The theoretical reason is that the franchises are grant-
ed by the State, and that they can only be vacated or
forfeited in a proceeding by the State, which generally
takes the form of a proceeding at law by information
in the nature of a *quo warranto.'*

"In Wheeler v. Pullman Iron & Steel Co., 143 Ill.
197, in treating of this question, the rule was again
announced that 'in the absence of statutory authority,
courts of chancery had no jurisdiction to decree a dis-
solution of a corporation by declaring a forfeiture of
its franchise, either at the suit of an individual or of
the State. [Verplanck v. Merchants' Ins. Co., 1 Edw.
Ch. 84; Doyle v. Peerless Petroleum Co., 44 Barb. 239;
Folger v. Columbia Ins. Co., 99 Mass. 274; Attorney-
General v. Bank of Niagara, 1 Hopk. 354; Denike v.
Cement Co., 80 N. Y. 605.] The mode of enforcing a
forefeiture of the charter at common law was by *scire
facias* or *quo warranto* in courts of law only, and at
the suit, only, of the sovereign.' It will be observed
in that case that the court pointed out that there was
a statute in that State conferring upon courts of
equity full power, on good cause shown, to dissolve
or close up the business of any corporation, and to
appoint a receiver to take charge of the assets.

"Similar statutes have been enacted in other
States, but, so far as this State is concerned, we know
of no statute which undertakes to authorize a court of
equity to dissolve a corporation; hence, in the absence

of such a statute the rule as herein indicated as to the powers of a court of equity, would be applicable.

"In Life Indemnity Assn. v. Hunt, 127 Ill. 257, it was again ruled that in the absence of statutory provisions courts of equity have no jurisdiction to decree the dissolution of a corporation by forfeiture of its franchises, either at the suit of an individual, or at the suit of the State; citing in support of such rule Attorney-General v. Utica Ins. Co., 2 Johns Ch. 370; Slee v. Bloom, 5 id. 366; State v. Merchants' Ins. Co., 8 Humph. 234; Attorney-General v. Bank of Niagara, 1 Hopkins' Ch. 334; Doremus v. Dutch Reformed Church, 3 N. J. Eq. 332; Doyle v. Peerless Petroleum Co., 1 Edw. Ch. 83; Strong v. McCagg, 55 Wis. 624; 2 Morawetz on Corporations, sec. 1040. It was also pointed out in that case that in all cases holding that courts of equity have no power in the absence of a statute to decree a dissolution of a corporation, it is uniformly admitted, whenever the question has arisen, that jurisdiction to decree the dissolution of a corporation may be conferred upon courts of equity by statute.

"In Neall v. Hill, 16 Cal. 145, treating of this proposition, the law applicable to this subject was stated in this language: 'It is well setled that a court of equity, as such, has no jurisdiction over corporate bodies for the purpose of . . . winding up their concerns. We do not find that any such power has ever been exercised, in the absence of a statute conferring the jurisdiction.'

"In the French Bank case, 53 Cal. l. c. 551, it was said: 'Of course, it is not to be doubted that the trustees of a corporation, the persons who constitute its directors, and from time to time exercise the corporate authority in the management of its affairs, are subject to the control of courts of equity, or, as observed by Chancellor Kent, "that the persons who from time to time exercise the corporate powers, may, in their char-

acter of trustees, be accountable to this court (the court of chancery) for a fraudulent breach of trust; and," he adds, "to this plain and ordinary head of equity the jurisdiction of this court over corporations ought to be confined." [Attorney-General v. Utica Ins. Co., 2 Johns. Ch. 388.] And in the exercise of these admitted equity powers of the court, referable to the well-known grounds upon which its jurisdiction ordinarily proceeds, embracing the cognizances of fraud, accident, trust, and the like, the rights of natural persons injured or put to hazard through corporate proceedings unauthorized by law, will find ample protection and redress.'

"In Denike v. Cement Lime Co., 80 N. Y. 599, the plaintiffs who were stockholders in such Lime Company, sought a dissolution of the corporation and the appointment of a receiver to take charge of its assets. EARL, J., speaking for the Court of Appeals of New York, in treating of the proposition as to whether the plaintiffs, as stockholders in the case, could maintain the action for the dissolution of the corporation and the appointment of a receiver, announced the conclusions of that court in this language: 'A corporation owes its life to the sovereign power, and under what circumstances it shall forfeit or be deprived of that life, depends upon the same power. A corporation may be dissolved by forfeiture through abuse or neglect of its franchises; but such forfeiture, unless there be special provisions by statute, can only be enforced by the sovereign in some proceeding instituted in its behalf. Here there is no allegation in the complaint that this corporation had forfeited its charter, or that it had in any way become dissolved; but a portion of the relief prayed is that it be dissolved. All the stockholders uniting might undoubtedly surrender the franchise of a corporation and work its dissolution. But can a portion of them do this, in the absence of statutory authority? There is no statute in this State which au-

thorizes a portion of the stockholders to maintain an action to dissolve a manufacturing corporation, and I know of no decision holding that they can. The statutes (2 R. S. 467) provide for the voluntary dissolution of corporations, but that must be upon application to a proper court "of the directors, trustees or other officers having the management of the concerns" of the corporation, but not upon the application of a portion of the stockholders.' In further discussing the question in that case, the learned judge remarked: 'There is abundance of authority for holding that there is no general power in a court of equity for sustaining such an action as this prosecuted by a portion of the stockholders,' citing Verplanck v. Mercantile Ins. Co., 1 Edw. Ch. 84; Galwey v. Sugar Refining Co., 13 Abb. Pr. 211, s. c., 36 Barb. 256; Ramsey v. Erie Railway Co., 7 Abb. Pr. (N. S.) 156, 181; Howe v. Deuel, 43 Barb. 505; Latimer v. Eddy, 46 Id. 61; Belmont v. Erie Railway Co., 52 Id. 637, 665; Gilman v. Green Point Sugar Co., 4 Lans. 483; Wilmersdoerffer v. Lake Mahopac Imp. Co., 18 Hun. 387.

"In Thompson v. Greeley, 107 Mo. 577, while the proposition of the power of a court of equity to dissolve a corporation was not in judgment before the court, yet in treating of the question of the appointment of receivers and their duties, it is clear that the court fully recognized the general rule, as heretofore pointed out, applicable to that subject; and in meeting the contention in that case that there was no authority to appoint a receiver to wind up the affairs of a corporation, it was pointed out that 'the temporary control of an insolvent corporation by a court and a receiver does not operate as a dissolution and forfeiture of its franchises. After the debts have been paid, and the necessary capital restored, this corporation could resume business under its original charter.'

"In Decker v. Gardner, 124 N. Y. 334, in discussing this subject it was again pointed out that 'the

power to declare a forfeiture of corporate franchises was originally in England vested in courts of law, and was exercised in a proceeding brought by the Attorney-General in the name of the sovereign. The court of chancery never assumed jurisdiction in such cases until it was conferred by act of Parliament. It declined until the power was conferred by statute, to . . . dissolve corporate bodies.' And it was also said in that case, referring to the judicial history of the courts, that 'the courts of this country followed the English system,' citing numerous cases in support of such statement. Following this it was indicated by that case that the jurisdiction in courts of equity to dissolve corporations is now a subject of statutory regulation in a number of the states.

"With the exception of Miner v. Ice Co., 93 Mich. 97, the rule announced by the text-writers and the adjudications of the appellate courts of the various states, has been strictly adhered to. The Michigan case, upon the facts disclosed by the record, held that the relief prayed for should be granted even though the decree had to go to the extent of dissolving the corporation; however, it was with commendable frankness conceded that 'the general rule undoubtedly is that courts of equity have no power to wind up a corporation, in the absence of statutory authority.'

"Learned counsel for respondents upon this question direct our attention to the cases of Cantwell v. Columbia Lead Co., 199 Mo. l. c. 36-43; State ex rel. v. Bank, 197 Mo. l. c. 593; State ex rel. v. Scarritt, 128 Mo. l. c., 339. We have given those cases a very careful examination, and with the highest respect for the views entertained by learned counsel we are unable to assent to the insistence that those cases furnish any support to the contention that a court of equity has any power to dissolve a corporation.

"In Cantwell v. Columbia Lead Co., while it is true the petition for the appointment of a receiver did pray

for the dissolution of the corporation, it will be observed that case reached this court by appeal from an order refusing to revoke the appointment of a receiver and no conclusion was announced in the case, except that the court had jurisdiction to appoint a receiver. The proposition of the power of a court of equity to dissolve a corporation was not in judgment before the trial court in the Cantwell Case.

"In State ex rel. v. Scarritt the proposition now under consideration was not only not involved, but was not discussed. That proceeding sought a writ of prohibition, and in treating of it this court announced the rules of law applicable to the issuance of writs of that character—on the one hand if the trial court had no jurisdiction or was about to do acts in excess of its power and jurisdiction, that the writ would go. On the other hand, if the court had jurisdiction of the subject-matter, then it was not a question of whether or not the petition in the proceeding to which the writ of prohibition was to apply stated a good cause of action; as to that question the court had a right to consider and rule upon the petition. In other words, it was ruled in that case that where jurisdiction over the parties and the subject of the cause is acquired, any error of the trial court in ruling on the sufficiency of the pleading forming the basis of the suit cannot be corrected by resort to a writ of prohibition. It was held in that case, and rightfully so, that the court had full power to do the act which it was invoked to do, namely, appoint a receiver of the assets of the corporation, and to determine in the first place whether the facts warranted that action of the court. Manifestly, that case has no application to the proposition now under consideration as to the power of a court of equity, in the absence of any statute conferring such power, to dissolve a corporation.

"State ex rel. v. Bank, supra, to which our attention has been directed, does not in any way undertake

to determine the question we are now considering.    It does discuss the question of receivership, and concedes the holding that a receivership does not dissolve a corporation, then proceeds to point out the usual result flowing from the appointment of a receiver, as a reason why there should be extreme caution in the first instance of appointing even a receiver.    It is clear that the case falls far short of furnishing any support to the insistence that a court of equity has power, in the absence of statutory authority, to dissolve a corporation.

"We see no necessity for further discussing this proposition.    If the rule announced by the eminent text-writers, to which we have made reference, and the uniform holdings of practically all the courts that have treated of the subject, that the rule announced by the text-writers is sound and should be adhered to, are to be longer followed, then we see no escape from the conclusion that the chancellor in the case of Watkins et al. v. Donnell Manufacturing Company et al. exceeded his power in rendering a decree dissolving the Donnell Manufacturing Company, a corporation, and this court upon the application presented, notwithstanding the decree has been entered, may prohibit the further exercise of any unauthorized jurisdiction in attempting to enforce such decree."

That case was carefully considered by the Court in Banc, and after a careful reconsideration of it, we are fully satisfied with the law as there announced and the conclusions therein reached.    There is nothing further that could be said upon the subject.

That case is controlling in the case at bar; and we are, therefore, of the opinion that the judgment should be reversed and the cause remanded, with directions to the circuit court to set aside its decree and dismiss plaintiffs' bill.    *Woodson, J.,* concurs in these views.

233 Sup.—29

## DISSENTING OPINION.

GRAVES, J.—I dissent from the majority opinion in this case for two reasons. First, I do not agree with my brothers as to the construction given to the petition. The petition recites a mass of matter, but it is all recited as matters of inducement to the one ultimate desire of the pleader, and this ultimate desire was the dissolution of this corporation by and through a court of equity. To my mind therefore, the petition is purely one for the dissolution of a corporation in this unknown and practically unheard of method. The opinion concedes that a court of equity has no such powers, but to my mind undertakes to plead for the plaintiff, and upon a pleading erected by the court announces a theory of law.

But even if the petition be as the majority opinion construes it to be (or as I think the majority opinion has *ex mero motu* made it to read) yet I do not agree to the law as announced, and thus my second reason for dissenting. By the ruling in this case, the court does by indirection that which it concedes it cannot do by direction. The court does not openly put the corporation to death, but by indirection accomplishes the same result by slowly but surely starving it to death. When the corporation's property is seized and confiscated, the corporation must *ex necessitate* decay and die.

Personally, if driven to a choice between the two methods above indicated, I would much rather violate all precedent, and assume the power to kill and wind up a corporation in a direct method, than to undertake to do the same thing by indirection. Personally I am opposed to the grasping desire expressed in some of the opinions of courts of equity. Up to this time, we have been reasonably conservative in reaching out the arms of equity for the mere purpose of administering the

business affairs of men and of corporations. Some courts, it is true, have seemingly courted the appointment of receivers and with much fervor reached out the arms of equity and bound hand and foot even solvent and going corporations, but to that doctrine I do not subscribe. The ultimate end is a government by the courts, and this is repugnant to our principles of government. We should not do by indirection the very thing which we concede we cannot, upon principle and authority, do by direction. The policy is a dangerous one. Relief could be obtained in this case without putting the corporation to death through the indirect method of a receivership for a going and solvent concern. The judgment of the circuit court should be reversed outright.

*Woodson, J.,* concurs in these views.